FILED
U.S. DISTRICT COURT
MIDDLE GEORGIA
01 APR 26 AM 10: 29
Yadie Peters
DEPUTY CLERK
ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

JOHN D. MARSHALL, M. D.

Plaintiff,

v.

AMERICUS-SUMTER COUNTY HOSPITAL AUTHORITY d/b/a SUMTER REGIONAL HOSPITAL, INC., d/b/a SUMTER REGIONAL HOSPITAL; SOUTHWEST GEORGIA HEALTHCARE ASSOCIATION, INC.; SOUTHWEST GEORGIA HEALTHCARE RESOURCES, INC.; JERRY ADAMS, Indiv., and in his Official capacity as CEO OF SUMTER REGIONAL HOSPITAL, INC., SOUTHWEST GA. HEALTHCARE RESOURCES, INC., ANDREW C. CARLSON, M.D., Indiv., and in his Official capacity as CEO, MEDICAL DIRECTOR, and CHAIRMAN OF THE BOARD OF DIRECTORS OF SOUTHWEST GEORGIA HEALTHCARE ASSOCIATION, INC.; AMERICUS PEDIATRICS, P.C.; JOSEPH W. KING, III, M.D., Indiv., and in his Official capacity as CHAIRMAN OF THE CREDENTIALING COMMITTEE OF SOUTHWEST GEORGIA HEALTHCARE ASSOCIATION, INC.; JOSEPH W. KING, III, M.D., P.C.; A. GATEWOOD DUDLEY, M.D., Indiv., and in his Official capacity as a Member of the SUMTER REGIONAL HOSPITAL MEDICAL EXECUTIVE COMMITTEE; A GATEWOOD DUDLEY, M.D., P.C.; GREGORY A. GARTH, M.D., Indiv., and in his Official capacity as a Member of the SUMTER REGIONAL HOSPITAL MEDICAL EXECUTIVE COMMITTEE; SUMTER E.N.T., P.C.; KENNETH E. DINELLA, M.D., Indiv., and in his Official capacity as a Member of the SUMTER REGIONAL HOSPITAL MEDICAL EXECUTIVE COMMITTEE; MICHAEL S. BUSMAN, M.D., Indiv., and in his Official capacity as a Member of the SUMTER REGIONAL HOSPITAL MEDICAL EXECUTIVE COMMITTEE; SUMTER FAMILY MEDICINE and SPORTS MEDICINE CENTER; CHANH M. TU, Indiv., and in his Official capacity as a Member of the SUMTER

CIVIL ACTION NO.

1:01-CV-79-3



REGIONAL HOSPITAL MEDICAL EXECUTIVE *
COMMITTEE; and GWENDOLYN V. MORGAN, M.D., *
Indiv., and in her Official capacity as a Member of the *
SUMTER REGIONAL HOSPITAL MEDICAL *
EXECUTIVE COMMITTEE, *
*
Defendants. *

**INTRODUCTION**

COMES NOW JOHN D. MARSHALL, M.D., Plaintiff in the above-styled action, individually, in his capacity as a medical doctor, in his capacity as President of the Americus Sumter Chapter of the National Association for the Advancement of Colored People, and in his capacity as Publisher of *The AmericUSumter Observer*, by and through counsel, and files this his Complaint against the named and unnamed defendants for declaratory relief, injunctive relief and for damages to redress deprivation of rights secured to Plaintiff under the laws of the Constitutions of the United States of America and the State of Georgia, and the Statutory laws of the State of Georgia, and alleges as follows:

1.

Plaintiff, a Black, male, is a physician duly licensed to practice medicine under the laws of the State of Georgia. Plaintiff is and has been at all times material to this action, the President of the Americus Sumter County chapter of the National Association for the Advancement of Colored People (NAACP). Plaintiff is and has been at all times material to this action, the publisher of *The AmericUSumter Observer*, a newspaper whose mission is to chronicle the social, political, economic and cultural realities of the Black community, locally, regionally, nationally, and internationally.

2.

The jurisdiction of this Court is invoked to secure protection and to redress deprivation of rights secured by the First Amendment and the Fourteenth Amendment of the United States Constitution, 42 U.S.C. §§ 1981, 1983, 1985(2), 1985(3), 1986[1], and 1988.

**PARTIES**

3.

John Marshall, M.D., the Plaintiff in the above-styled action, is a Black physician with his principal residence at 155 Mockingbird Drive, Americus, Sumter County, Georgia and has his principal place of business located at 905 B North Jackson Street, Americus, Georgia. John Marshall, M.D. has been engaged in the practice of family medicine since 1986.

4.

Plaintiff John Marshall, M.D. has also served as President of the Americus-Sumter Chapter of the National Association for the Advancement of Colored People (NAACP) since 1995. Plaintiff was serving as President of the local chapter of the NAACP at all times material to the allegations contained herein.

5.

Plaintiff John Marshall, M.D. is also the owner and publisher of a Newspaper entitled *The AmericUSumter Observer*. Said newspaper covers issues related to the African American

---

[1] Plaintiff has also filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) which is related to the allegations raised in this Complaint. Plaintiff will seek leave to amend his Complaint to add a claim pursuant to 42 U.S.C.2000e et seq., when a notice of right to sue is received from the EEOC provided that the same is received before a Pretrial Order is entered in this case.

community on a local, statewide, and national level. Plaintiff was the owner and publisher of *The AmericUSumter Observer* at all times material to the allegations contained herein.

6.

Defendant Americus-Sumter County Hospital Authority d/b/a Sumter Regional Hospital, Inc., d/b/a Sumter Regional Hospital with its principal place of business in Americus, Sumter County, Georgia is subject to the jurisdiction of this Court. Defendant Americus-Sumter County Hospital Authority d/b/a Sumter Regional Hospital, Inc., d/b/a Sumter Regional Hospital is a nonprofit corporation organized under the laws of the State of Georgia and operates its principal facility at 100 Wheatley Drive, Americus, Sumter County, Georgia with the purpose of providing medical treatment and patient health care.

7.

Defendant Sumter Regional Hospital is a public hospital in Sumter County. It is a vital necessity that a physician who seeks to practice medicine in Sumter County be a member of the medical staff of Sumter Regional Hospital in order for his patients to have access to hospital facilities in the area within which the physician provides medical services. In order to admit a patient to Sumter Regional Hospital, a physician must have staff privileges at the hospital.

8.

Defendant Americus-Sumter County Hospital Authority d/b/a Sumter Regional Hospital, Inc., d/b/a Sumter Regional Hospital may be served by delivering a copy of the Complaint and Summons to Jerry W. Adams, the Registered Agent of Defendant Sumter Regional Hospital, Inc., and the CEO of Sumter Regional Hospital. As such, Jerry W. Adams may be served at 100 Wheatley Dr., Americus, Georgia 31709.

9.

Defendant Southwest Georgia Healthcare Association, Inc. is a non-profit corporation organized under the laws of the state of Georgia with its principal place of business in Americus, Georgia. As such, Defendant Southwest Georgia Healthcare Association, Inc. is subject to the venue and jurisdiction of this Court. Defendant Southwest Georgia Healthcare Association, Inc. is engaged in the business of providing managed healthcare services. Defendant Southwest Georgia Healthcare Association, Inc. may be served by delivering a copy of the Complaint and Summons to its Registered Agent, Jerry W. Adams at 100 Wheatley Drive, Americus, Georgia 31709.

10.

Defendant Sumter Regional Hospital owns fifty (50) percent of the stock of Defendant Southwest Georgia Healthcare Association, Inc. Defendant Sumter Regional Hospital has funded and/or is funding the continuing operation of Defendant Southwest Georgia Healthcare, Inc.

11.

Defendant Southwest Georgia Healthcare Resources, Inc. is a non-profit corporation organized under the laws of the state of Georgia with its principal place of business in Americus, Georgia. As such, Defendant Southwest Georgia Healthcare Resources, Inc. is subject to the venue and jurisdiction of this Court. Defendant Southwest Georgia Healthcare Resources, Inc. is engaged in the business of a holding company for Sumter Regional Hospital, Inc., and several other subsidiaries. Defendant Southwest Georgia Healthcare Resources, Inc. may be served by

delivering a copy of the Complaint and Summons to its Registered Agent, Jerry W. Adams at 100 Wheatley Drive, Americus, Georgia 31709.

12.

Defendant Jerry W. Adams is a resident of Sumter County, Georgia and is subject to the jurisdiction and venue of this Court. He may be personally served by delivering a copy of the Complaint and Summons at 100 Wheatley Drive, Americus, Georgia 31709. Defendant Jerry W. Adams is sued individually, and in his official capacities as: CEO of Sumter Regional Hospital, Inc.; CEO of Sumter Regional Hospital; and CEO of Southwest Georgia Healthcare Resources, Inc.

13.

Defendant Andrew C. Carlson, M.D. is a resident of Sumter County, Georgia and is subject to the jurisdiction and venue of this Court. He may be personally served by delivering a copy of the Complaint and Summons to him at Suite 304, 100 Wheatley Drive, Americus, Georgia 31709. Defendant Andrew C. Carlson, M.D. is sued individually, and in his official capacities as: CEO of Southwest Georgia Healthcare Association, Inc. and CEO of Americus Pediatrics, P.C.

14.

Defendant Americus Pediatrics, P.C. is a professional corporation organized under the laws of the State of Georgia with its principal place of business in Americus, Georgia. As such, Defendant Americus Pediatrics, P.C. is subject to the jurisdiction and venue of this Court. Defendant Andrew C. Carlson, M.D. is the CEO and owner of Americus Pediatrics, P.C. Defendant Americus Pediatrics, P.C. is liable for the unlawful behavior and conduct of its

officers, owners and/or agents. Defendant Americus Pediatrics, P.C. may be served by delivering a copy of the Complaint and Summons to Andrew C. Carlson, M.D., at Suite 304, 100 Wheatley Drive, Americus, Georgia 31709.

15.

Defendant Joseph W. King, III, M.D. is a resident of Sumter County, Georgia and is subject to the jurisdiction and venue of this Court. He may be personally served by delivering a copy of the Complaint and Summons to him at 915 Elmo Street, Americus, Georgia 31709. Defendant Joseph W. King, III, M.D. is sued individually, and in his official capacities as: Chairman of the Credentialing Committee of Southwest Georgia Healthcare Association, Inc., Member of the Board of Directors of Southwest Georgia Healthcare Association, Inc., a Member of the Medical Executive Committee at Sumter Regional Hospital, and owner of Joseph W. King, III, M.D., P.C.

16.

Defendant Joseph W. King, III, M.D., P.C. is a professional corporation organized under the laws of the State of Georgia with its principal place of business in Americus, Georgia. As such, Defendant Joseph W. King, III, M.D., P.C. is subject to the jurisdiction and venue of this Court. Defendant Joseph W. King, III, M.D. is the CEO and owner of Joseph W. King, III, M.D., P.C. Defendant Joseph W. King, III, M.D., P.C. is liable for the unlawful behavior and conduct of its officers, owners and/or agents. Joseph W. King, III, M.D., P.C. may be served by delivering a copy of the Complaint and Summons to Joseph W. King, III, M.D., at 915 Elmo Street, Americus, Georgia 31709.

17.

Defendant A. Gatewood Dudley, M.D., is a resident of Sumter County, Georgia and is subject to the jurisdiction and venue of this Court. He is sued individually, and in his capacity as a member of Sumter Regional Hospital Medical Executive Committee and in his official capacity as Medical Director of Sumter Regional Hospital. Defendant Gatewood Dudley, M.D. may be served by delivering a copy of the Complaint and Summons to him at 401 S. Lee Street, Americus, Georgia 31709.

18.

Defendant A. Gatewood Dudley, P.C. is a professional corporation organized under the laws of the State of Georgia with its principal place of business in Americus, Georgia. As such, A. Gatewood Dudley, P.C. is subject to the jurisdiction and venue of this Court. Defendant A. Gatewood Dudley, M.D. is an officer and owner of A. Gatewood Dudley, P.C. Defendant A. Gatewood Dudley, P.C. is liable for the unlawful behavior and conduct of its officers, owners and/or agents. A. Gatewood Dudley, P.C. may be served by delivering a copy of the Complaint and Summons to A. Gatewood Dudley, M.D. at 401 S. Lee Street, Americus, Georgia 31709.

19.

Defendant Gregory A. Garth, M.D., is a resident of Sumter County, Georgia and is subject to the jurisdiction and venue of this Court. He is sued individually, and in his capacity as a member of Sumter Regional Hospital Medical Executive Committee. Defendant Gregory A. Garth, M.D. may be served by delivering a copy of the Complaint and Summons to him at 1526 Elm Avenue, Americus, Georgia 31709.

20.

Defendant Sumter E.N.T., P.C. is a professional corporation organized under the laws of the State of Georgia with its principal place of business in Americus, Georgia. As such, Sumter E.N.T., P.C. is subject to the jurisdiction and venue of this Court. Defendant Gregory A. Garth, M.D. is an officer and owner of Sumter E.N.T., P.C. Defendant Sumter E.N.T., P.C. is liable for the unlawful behavior and conduct of its officers, owners and/or agents. Sumter E.N.T., P.C. may be served by delivering a copy of the Complaint and Summons to Gregory A. Garth, M.D. at 1526 Elm Avenue, Americus, Georgia 31709.

21.

Defendant Chanh M. Tu, M.D., is a resident of Sumter County, Georgia and is subject to the jurisdiction and venue of this Court. He is sued individually, and in his capacity as a member of Sumter Regional Hospital Medical Executive Committee. Defendant Chanh M. Tu, M.D. may be served by delivering a copy of the Complaint and Summons to him at 1119 E. Lamar Street, Americus, Georgia 31709.

22.

Defendant Michael S. Busman, M.D., is a resident of Sumter County, Georgia and is subject to the jurisdiction and venue of this Court. He is sued individually, and in his capacity as a member of Sumter Regional Hospital Medical Executive Committee and as agent and owner of Sumter Family Medicine and Sports Medicine Center. Defendant Michael S. Busman, M.D. may be served by delivering a copy of the Complaint and Summons to him at 1102 E. Lamar Street, Americus, Georgia 31709.

23.

Defendant Sumter Family Medicine and Sports Medicine Center is a professional

corporation organized under the laws of the State of Georgia with its principal place of business in Americus, Georgia. As such, Sumter Family Medicine and Sports Medicine Center is subject to the jurisdiction and venue of this Court. Defendant Michael S. Busman, M. D. is an officer and owner of Sumter Family Medicine and Sports Medicine Center. Defendant Sumter Family Medicine and Sports Medicine Center is liable for the unlawful behavior and conduct of its officers, owners and/or agents. Sumter Family Medicine and Sports Medicine Center may be served by delivering a copy of the Complaint and Summons to Michael S. Busman, M.D. at 1102 E. Lamar Street, Americus, Georgia 31709.

24.

Defendant Kenneth E. DiNella, M.D., is a resident of Sumter County, Georgia and is subject to the jurisdiction and venue of this Court. He is sued individually, and in his capacity as a member of Sumter Regional Hospital Medical Executive Committee. Defendant Kenneth E. DiNella, M.D. may be served by delivering a copy of the Complaint and Summons to him at 1120 Elm Avenue, Americus, Georgia 31709.

25.

Defendant Gwendolyn V. Morgan, M.D., is a resident of Sumter County, Georgia and is subject to the jurisdiction and venue of this Court. She is sued individually, and in her capacity as a member of Sumter Regional Hospital Medical Executive Committee. Defendant Gwendolyn V. Morgan, M.D. may be served by delivering a copy of the Complaint and Summons to her at 415 N. Jackson Street, Americus, Georgia 31709.

**FACTS RELEVANT TO ALL COUNTS**

26.

On or about July 9, 1996 at 7:30 a.m., Plaintiff, in his capacity as President of the Sumter local chapter of the National Association for the Advancement of Colored People (hereinafter referred to as "NAACP"), attended a meeting along with the Vice President of the NAACP and officials of Sumter Regional Hospital, Joe King, John Hefner, and J. N. Cook. The July 9, 1996 meeting of the NAACP with the officials of Sumter Regional Hospital was scheduled for the purpose of addressing issues of employment discrimination against Blacks by Sumter Regional Hospital. Although Jerry Adams, CEO of Sumter regional Hospital was not present at the initial meeting, he was mailed a copy of the Meeting Agenda which outlined the specific topics covered during the meeting.

27.

Subsequent to the initial meeting of the NAACP with officials from Sumter Regional Hospital, there have been several such meetings, some of which were attended by Jerry Adams acting in his capacity of CEO of Sumter Regional Hospital. Due to the meetings that were held, Plaintiff was optimistic that the Sumter Regional Hospital officials and the Board members of the Americus Sumter chapter of the NAACP could work to resolve the problems underlying the racial discrimination against Blacks by Sumter Regional Hospital.

28.

After initially agreeing to meet with NAACP Board members, the Sumter Regional Hospital Board officials later decided not to attend such meetings. In the November 1998 edition of *The AmericUSumter Observer*, an article was published which discussed Sumter Regional

Hospital's refusal to meet with the NAACP concerning racial discrimination at Sumter Regional Hospital. In the November 1998 article, Plaintiff was quoted as stating that the NAACP was asking for the removal of Defendant Jerry Adams and that an end be put "to the level of racism that exists at our only local hospital..."

29.

Because Defendant Jerry Adams was the President and CEO of Sumter Regional Hospital, Plaintiff, while acting in his capacity as President of the NAACP, expressed concerns that the only way to combat the level of racism which existed at Sumter Regional Hospital was to start at the top and work down from there because it was evident to Plaintiff that Jerry Adams had no intentions of acting in good faith to address the issues of racism by and within Sumter Regional Hospital.

30.

Although he was aware of racial discrimination at Sumter Regional Hospital and although he had received many complaints about such discrimination in his capacity as President of the Americus Sumter chapter of the NAACP, Plaintiff had never sought to file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) due to his initial, incorrect perception that the racial discrimination by Sumter Regional Hospital could be addressed by the NAACP's meetings with the Sumter Regional Hospital Board. After it became apparent that the hospital officials would not voluntary engage in good faith attempts to resolve racial discrimination at Sumter Regional Hospital, on or about December 28, 1998, Plaintiff, acting in his capacity of President of the Sumter chapter of the NAACP, filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter referred to as

"EEOC") alleging racial discrimination against Blacks by Sumter Regional Hospital. The Charge sought to be representative of a class of Black persons discriminated against by Sumter Regional Hospital.

31.

After the charge of discrimination was filed with the EEOC, Plaintiff, while acting in his official capacity as President of the Americus Sumter chapter of the NAACP, cooperated and communicated with the EEOC regarding the charge of racial discrimination that had been filed against Sumter Regional Hospital. The Sumter Regional Hospital officials knew that Plaintiff, in his capacity as President of the Americus Sumter chapter of the NAACP, had filed the charge of racial discrimination with EEOC and they knew that Plaintiff was the contact person with the EEOC regarding said charge.

32.

In addition to the Complaint filed with the EEOC regarding racial discrimination at Sumter Regional Hospital, *The AmericUSumter Observer*, the newspaper published by Plaintiff, also periodically contained articles addressing the problems of racial discrimination by and within Sumter Regional Hospital. The October 1999 edition of *The AmericUSumter Observer* contained an article pertaining to racial discrimination at Sumter Regional Hospital. Plaintiff was quoted in the article as saying "Five years ago we begged Jerry Adams (Administrator Sumter Regional Hospital) and the Board to stop their blatant discrimination by race but they took us lightly." The article also stated Plaintiff's concerns that Defendant Jerry Adams had never allowed the NAACP to meet with the entire Board of Sumter Regional Hospital.

33.

On April 25, 2000, Ray Young, in his capacity as Chairman of Sumter Regional Hospital, Inc., wrote a letter to Mr. Roosevelt Mitchell, a Board member of the Americus Sumter branch of the NAACP, indicating that the Sumter Regional Hospital, Inc. Board members "would like to meet with you and all of the other board members of the Americus-Sumter County Branch of NAACP." Mr. Young's letter requested that Mr. Mitchell contact him and advise of the best time frame to schedule a meeting.

34.

On July 31, 2000, Mr. Young wrote a letter to Plaintiff, in his capacity as President of the Americus Sumter Chapter of the NAACP. Young's letter was in response to a letter written by Plaintiff on July 14, 2000, in his capacity as President of the Americus Sumter Chapter of the NAACP, wherein Plaintiff had proposed an agenda for the meeting between the Sumter Regional Hospital Board and the NAACP. Young indicated that he could not respond to the proposal for an agenda until he could consult with the other board members. He also indicated that the Sumter Regional Hospital Board would not be able to meet with the NAACP in August 2000.

35.

On August 24, 2000, Roy Young, in his capacity as Chairman of Sumter Regional Hospital, Inc., wrote a letter to Plaintiff,[2] in his capacity as President of the Americus Sumter Chapter of the NAACP, indicating that a meeting could be scheduled for either September 25, 2000 or September 26, 2000.

---

[2] The letter also indicated that Mr. Young also sent copies of the letter to the other board members of the Americus Sumter Chapter of the NAACP.

36.

On or about September 19, 2000, the EEOC closed its file because among other things, it found that many of the allegations of hiring and termination were found to be untimely. The notice of dismissal sent by the EEOC to Plaintiff on September 19, 2000, also informed Plaintiff that he had the right to sue the Respondents named in the charge of discrimination in the U.S. District Court within 90 days from the date he received the notice. On the very next day, after the EEOC forwarded the right to sue letter to Plaintiff, in his capacity as President of the Americus Sumter Chapter of the NAACP, and during the entire period thereafter, Plaintiff's practice of medicine at Sumter Regional Hospital has been filled with ridicule, intimidation, harassment, retaliation and harsh, disparate, discriminatory treatment unlike similarly situated physicians on the medical staff at Sumter Regional Hospital, all because of Plaintiff's race, Black, and because of his opposition to racial discrimination by Sumter Regional Hospital against Blacks while acting in his capacity as President of the Americus Sumter Chapter of the NAACP and as Publisher of *The AmericUSumter Observer*.

37.

On September 20, 2000, the day after the EEOC issued the right to sue letter to Plaintiff in his capacity as President of the NAACP, Andrew C. Carlson, M.D., in his official capacity as Medical Director of Southwest Georgia Healthcare Association, Inc. (hereinafter referred to as "SGHA"), wrote a letter to Plaintiff informing Plaintiff of an "out-of-network" referral concerning one of Plaintiff's patients for cardiology services. Carlson, individually, and in his official capacity as Medical Director of Southwest Georgia Healthcare Association, Inc., intentionally and wilfully used the alleged referral of one of Plaintiff's patients to an out-of-

network Provider in order to initiate the malicious, concerted effort of Sumter Regional Hospital and certain officials and individuals associated therewith to retaliate against Plaintiff for filing the Charge of Discrimination referenced in paragraph 30 herein.

38.

The Participating Provider Agreement between SGHA and the member physicians provides that "The Provider agrees to refer Enrollees, when medically appropriate, to Participating Providers." Plaintiff would refer patients to physicians outside of the PHO network when it was medically appropriate for him to do so. The Participating Provider Agreement between SGHA and the member physicians did not define, list, or otherwise provide how or when it was "medically appropriate" to refer patients outside of the network. The Participating Provider Agreement between SGHA and the member physicians did not expressly prohibit referrals outside of the network.

39.

To this date, SGHA has never informed Plaintiff of the identity of any patient(s) who were out of network referrals to out of network Providers. As outlined below, this alleged Complaint was used as a pretext to initiate the personal, malicious, intentional and vindictive assault on Plaintiff's ability to engage in the practice of medicine.

40.

The September 20, 2000 letter to Plaintiff was one of the early acts in furtherance of the conspiracy to retaliate against Plaintiff and drive him out of the practice of medicine in Americus Sumter County, all because of his race, Black, and because of his opposition to discriminatory practices by Sumter Regional Hospital against Blacks while acting in his capacity as President of

the Americus Sumter Chapter of the NAACP and as Publisher of *The AmericUSumter Observer*. During this time, unbeknownst to Plaintiff, the defendants, jointly and maliciously and acting under color of state law, were already acting in concert to suspend Plaintiff's privileges from the medical staff at Sumter Regional Hospital and to terminate his contractual agreement with Southwest Georgia Healthcare Association, Inc.

41.

The defendants, named and unnamed, did combine, confederate, agree and conspire with each other and with certain unnamed persons, to maliciously and unlawfully deprive John D. Marshall, M.D. of his constitutional rights while acting under color of state law and racially discriminatory customs and practices by the defendants acting individually and in their official capacities combining with other persons acting in their individual and official capacities, with the intent to deprive John D. Marshall, M.D. of his right to practice medicine. All of the unlawful acts complained of were done by the defendants and were done intentionally, willfully, and maliciously, with the specific intent to cause harm to John D. Marshall, M.D.

42.

Defendants Jerry Adams and Joseph M. King, III, M.D., had already sought and recruited a Black family practice physician to join the medical staff at Sumter Regional Hospital before Plaintiff's privileges were suspended. This was done for two reasons. First, since they both knew that Plaintiff's medical staff privileges at Sumter Regional Hospital were about to be suspended, the intent was to bring in a Black family practice physician so that the hospital would not suffer from the loss of Plaintiff's large, predominantly Black patient base because since he would not be able to use Sumter Regional Hospital, many of Plaintiff's patients would have to

see another doctor if they needed and/or desired Sumter Regional Hospital services. Secondly, since he had already been constantly complaining of racial discrimination against Blacks by Sumter Regional Hospital, the defendants sought to bring in a Black physician in order to thwart any potential claim of racial discrimination made by Plaintiff.

43.

On September 24, 2000, a meeting was held wherein representatives from Sumter Regional Hospital met with the Board Members of the Americus Sumter Branch of the NAACP. Due to the presence of the hospital's attorney, the members of the NAACP walked out of the meeting because they were not represented by counsel and they felt that the presence of counsel at such a meeting would be counterproductive.[3] The October 2000 edition of *The AmericUSumter Observer* published an article about the NAACP's walkout of the meeting with the Sumter Regional Hospital representatives and the article stated that the NAACP Board members were in agreement with the walkout.

44.

On October 16, 2000, Roy Young, in his capacity as Chairman of the Board of Directors of the Sumter Regional Hospital, Inc., again requested to meet with the Americus-Sumter County Branch of the NAACP. Young's invitation stated that the NAACP's attorney could attend the meeting if desired but the NAACP refused to meet with the Sumter Regional Hospital Board again due to the futility of previous attempts to meet and resolve the racial discrimination at

---

[3] After Plaintiff informed the Sumter Regional Hospital representatives that the NAACP felt that the presence of counsel was unnecessary, Defendant Gatewood Dudley, M.D. asked if the other NAACP board members had a problem with the hospital's counsel being present. The NAACP board members proceeded to leave the meeting when the hospital's counsel insisted on staying at the meeting.

Sumter Regional Hospital.[4]

45.

The defendants, while acting jointly, maliciously and in concert, then sought to intensify their efforts in suspending Plaintiff's privileges on the medical staff at Sumter Regional Hospital and in terminating Plaintiff's contractual agreement with Southwest Georgia Healthcare Association, Inc. (SGHA). On October 17, 2000, Andrew Carlson, MD, in his capacity as Medical Director of SGHA wrote a letter informing Plaintiff that the SGHA Board of Directors had requested a corrective action with regards to Plaintiff's acts, demeanor, practices or conduct related to the services Plaintiff had provided to enrollees in the plan sponsored by Textron Automotive Corporation.

46.

Attached to the October 17, 2000, letter sent to Plaintiff was a Resolution of the Board of Directors dated October 13, 2000. The Resolution provided in part that

> ***WHEREAS, the Board of Directors received a complaint from Textron Automotive Corporation ("Textron") regarding the Provider's referral patterns.***
>
> ***WHEREAS, the Board of Directors received utilization information from Secure Health, the third-party administrator for the Corporation's direct contract with Textron.***
>
> ***WHEREAS, the Board of Directors believes this reasonably reliable information indicates that the Provider may have exhibited acts, demeanor, practices, or conduct, regardless of whether it involves the performance of a contractual obligation with SGHA, that are reasonably likely to be:***
>
> 1. ***Detrimental to patient safety or to the delivery of quality care to enrollees,***
> 2. ***Unethical,***

---

[4] On November 20, 2000, in an Executive Meeting of the Americus-Sumter County Chapter of the NAACP, the local chapter voted unanimously to discontinue meeting with the Sumter Regional Hospital Board of Directors because the several meetings had been futile as to discussions for resolution of issues presented.

*3. Contrary to the Bylaws or Credentialing Plan,*
*4. Below acceptable professional standards,*
*5. Disruptive to SGHA operations,*
*6. An improper use of SGHA resources, or*
*7. Contrary to the primary purposes of SGHA.*

47.

The SGHA Credentialing Plan provides that the Criteria for Initiation of Corrective Action is as follows:

> ***A corrective action investigation may be initiated whenever reasonably reliable information indicates that a Participating Provider may have exhibited acts, demeanor, practices, or conduct, regardless of whether it involves the performance of a contractual obligation with SGHA, that is reasonably likely to be:***
>
> ***1. detrimental to patient safety or to the delivery of quality care to enrollees;***
> ***2. unethical;***
> ***3. contrary to the Bylaws or Credentialing Plan;***
> ***4. below acceptable professional standards;***
> ***5. disruptive to SGHA operations;***
> ***6. an improper use of SGHA resources; or***
> ***7. contrary to the primary purposes of SGHA.***

48.

With the exception of adding the words, "related to the services you have provided to enrollees in the plan sponsored by Textron Automotive Corporation," to the criteria for initiating corrective action which is expressly stated in the Credentialing Plan of the SGHA, Plaintiff has not been provided with any information as to what specific conduct, activities, acts or omissions he engaged in which justified the initiation of corrective action against him by SGHA.

49.

The Credentialing Plan of the SGHA provides that all requests for corrective action shall

be submitted to the Credentialing Committee in writing and supported by reference to the activities or conduct constituting grounds for the request and that a copy of the request shall be immediately sent to the Provider. Plaintiff has not received a copy of a request for corrective action which is supported by reference to activities or conduct constituting grounds for the request.

50.

The Credentialing Plan of the SGHA provides that prior to any adverse action being approved, the Credentialing Committee shall assure that the Participating Provider is given an opportunity to appear before the Committee and provide information in a manner and upon such terms as it deems appropriate. Plaintiff requested, but was not permitted to have the opportunity to appear before the Committee and provide information before the Committee concluded its investigation and made its recommendation, although the Committee did allow Plaintiff to meet with it after the recommendation had already been made on Corrective Action.

51.

Since they already knew that Plaintiff's medical staff privileges at Sumter Regional Hospital would be suspended, SGHA, its agents, employees, and officials initiated the Corrective Action against Plaintiff so that SGHA could peruse through the medical files in Plaintiff's office seeking to find information that could be used by Sumter Regional Hospital to suspend Plaintiff's privileges on the medical staff at Sumter Regional Hospital.[5] During the alleged investigation by

---

[5] Section V-5.3 of the Participating Provider Agreement that Plaintiff entered into with SGHA provided that all records, books, and papers of the Provider pertaining to Enrollees (patients entitled to benefits arranged through SGHA) shall be open to inspection upon reasonable notice and during normal business hours by SGHA.

SGHA, Plaintiff was informed that 97 patient records from his office needed to be reviewed in order to complete the investigation. However, the 97 patient records from Plaintiff's office were not reviewed before the Committee allegedly completed its investigation and made its recommendation on the Corrective Action Plan presented to Plaintiff.

52.

On November 17, 2000, Plaintiff was informed that the Committee had allegedly completed its investigation and made a recommendation to the Board of Directors of SGHA. Plaintiff was informed that a meeting had been scheduled for Monday, November 27, 2000 to inform Plaintiff of the results of the Committee's alleged investigation.

53.

On November 27, 2000, Plaintiff attended the meeting at Sumter Regional Hospital wherein he was informed of the Committee's Corrective Action Plan.

54.

On November 28, 2000, a day after the Corrective Action Plan had been shown to him, Plaintiff was informed by Joseph King, MD that the 97 patient records referred to in paragraph 51 above would be reviewed in Plaintiff's office on November 30, 2000. Since the Corrective Action Plan had already been recommended and approved, there was no reason for SGHA to obtain 97 patient charts from Plaintiff's office. These patient records were taken with the specific intent to seek to obtain information which could be used jointly by the SGHA officials and Sumter Regional Hospital officials to suspend Plaintiff's medical staff privileges at Sumter Regional Hospital.

55.

On November 29, 2000, Plaintiff signed a document presented to him by SGHA at the meeting on November 27, 2000. The document read as follows:

***Southwest Georgia Healthcare Association, Inc.***

***ACKNOWLEDGMENT AND ACCEPTANCE OF CORRECTIVE ACTION PLAN***

***By signing this form below, I, John D. Marshall, MD, acknowledge the following:***

***1) I have reviewed the evidence presented by the representatives of the Credentialing Committee and returned all copies of any materials given to me during the meeting;***

***2) I took the opportunity to ask questions of the representatives and understand the conclusions presented by them;***

***3) I agree to abide by the terms of the corrective action plan presented by the Credentialing Committee and implement its requirements in their entirety;***

***4) I understand that the Credentialing Committee has discussed the possibility that I will deny its conclusions and refuse to adopt its plan of correction. If I refuse to sign this acknowledgment and acceptance, the Credentialing Committee will recommend to the Board of Directors to terminate my participation in Southwest Georgia Healthcare Association, Inc.;***

***5) I have discussed this form with my attorney and understand its implications. If I do not return this form, with my signature, to Southwest Georgia Healthcare Association, Inc. within forty-eight (48) hours after the conclusion of this meeting with representatives of the Credentialing Committee, it will recommend to the Board of Directors to terminate my participation in Southwest Georgia Healthcare Association, Inc.***

______________________ ______________________

***Physician*** ***Date***

56.

On November 29, 2000, Plaintiff executed the form and returned it to SGHA because he did not want his participation in SGHA terminated. SGHA, through its agents, coerced Plaintiff into entering into this agreement in order effectuate the termination of Plaintiff's participation in

SGHA. Based upon the nature of the action taken against Plaintiff,[6] he was not entitled to a hearing on the merits of the complaints against him and he was never able to confront and/or cross examine the alleged complainant who allegedly initiated the Corrective Action that was taken against him.

57.

In a November 30, 2000, document entitled *Reconsideration Notice and Revocation of Notice of Right to Sue,* the EEOC revoked the Notice of Dismissal and Right to Sue letter that it had issued on September 19, 2000 in response to the Charge of Discrimination which had been filed by Plaintiff in December 1998, in his official capacity as President of the Americus-Sumter County branch of the NAACP. The defendants at Sumter Regional Hospital were upset that the EEOC had decided to revisit the issue of racial discrimination by Sumter Regional Hospital.

58.

On December 8, 2000, Plaintiff, in his capacity as President of the Americus-Sumter County chapter of the NAACP, sent a letter to the Board of Directors of Sumter Regional Hospital informing it that the Board's October request to meet with the NAACP was denied and that the local chapter of the NAACP had voted unanimously to discontinue meeting with the Sumter Regional Hospital Board of Directors.[7]

---

[6] Defendant Andrew Carlson, M.D., in his capacity as the Chairman of the Board of Directors of Southwest Georgia Healthcare Association, Inc., informed Plaintiff that since the Board's Corrective Action did not include a restriction or suspension of Plaintiff's privileges, Plaintiff was not entitled to a hearing on the Corrective Action.

[7] Plaintiff also sent a copy of the December 8, 2000 letter to others, including the EEOC, NAACP State Office, NAACP Regional Office, NAACP National Office, NAACP District Coordinator and Southwest Georgia Healthcare Association.

59.

In the December 8, 2000 letter submitted by Plaintiff to the Board of Directors of Sumter Regional Hospital, Plaintiff, in his capacity as President of the Americus-Sumter County chapter of the NAACP, submitted additional reports of discriminatory practices and included a list of pre-existing claims of racial discrimination which had been submitted to the EEOC on February 5, 1999.

60.

On December 8, 2000, Andrew Carlson, MD, in his capacity as Medical Director of SGHA, wrote Plaintiff a letter informing him that the Board of Directors of Southwest Georgia Healthcare Association, Inc., the Medical Director of SGHA, and the Sumter Regional Hospital Medical Director had voted to summarily suspend Plaintiff from participating in SGHA effective December 8, 2000. The notice indicated that the summary suspension occurred in order to ***"reduce the substantial likelihood of imminent injury or damage to the health or safety of any individual."***[8] Other than the aforementioned statement, the notice did not give any reason(s) as to why Plaintiff was summarily suspended from participating in SGHA.

61.

The Credentialing Plan of SGHA provides that summary suspension is warranted only upon receipt of information that a Participating Provider in SGHA no longer satisfies all the applicable credentialing criteria or that action must be taken immediately to protect the life of any

---

[8] SGHA, its officials, and/or agents caused this information regarding Plaintiff's summary suspension from participating in SGHA to be sent to the National Practitioners Data Bank and the Georgia Composite State Board of Medical Examiners. The information sent to these entities stated that Plaintiff was incompetent in providing medical treatment to his patients.

individual or to ***"reduce the substantial likelihood of imminent injury or damage to the health or safety of any individual."***

62.

Because the person(s) who decided to summarily suspend Plaintiff from participating in SGHA knew that Plaintiff satisfied all the applicable credentialing criteria as of December 8, 2000, and because they knew that on December 8, 2000, there was no need for any action to be taken immediately to protect the life of any individual patient of Plaintiff, the only way that Plaintiff could be summarily suspended from SGHA in accordance with the Bylaws and Credentialing Plan of SGHA would be if the action was taken to ***"reduce the substantial likelihood of imminent injury or damage to the health or safety of any individual."***

63.

Action taken for any other reason would have been in violation of the Credentialing Plan of SGHA. The SGHA Credentialing Plan allowed summary suspension to be done immediately as Plaintiff did not have the opportunity for a hearing prior to having his privileges of participating in SGHA being suspended. The defendants knowingly summarily suspended Plaintiff from participating in SGHA because they knew that Plaintiff's participation in SGHA could become effective immediately and that Plaintiff would not be afforded the opportunity to have a hearing prior to the suspension becoming effective.

64.

The Credentialing Plan does allow for the Participating Provider to request for the Credentialing Committee to conduct an expedited review of the summary suspension and

Plaintiff timely requested such a review.[9] However, Joseph King, III, MD, in his capacity as Chairman of the Credentialing Committee of SGHA informed Plaintiff on December 20, 2000 that his summary suspension was appropriate given the information available to the Committee and that no further investigation into Plaintiff's conduct was necessary. No further investigation was necessary because Plaintiff's suspension was based upon reasons other than Plaintiff's medical treatment of his patients. Plaintiff was summarily suspended from participating in SGHA because of the conspiracy to retaliate against Plaintiff and drive him out of the practice of medicine in Americus Sumter County, all because of his race, Black, and because of his opposition to discriminatory practices by Sumter Regional Hospital against Blacks while acting in his capacity as President of the Americus Sumter Chapter of the NAACP and as Publisher of *The AmericUSumter Observer*.

65.

King also informed Plaintiff his December 20, 2000 letter that under the Credentialing Plan, Plaintiff did not have a right to a hearing as a result of the Committee's decision.[10] The individual defendants knew that by first summarily suspending Plaintiff and then instituting a corrective action plan, they could prevent Plaintiff from obtaining a hearing on the merits of the appropriateness of his summary suspension in the first place. Without being afforded the

---

[9] On December 14, 2000, Plaintiff requested an interview before the Committee and an expedited review by the Credentialing Committee of the decision to summarily suspend him as allowed by the Credentialing Plan.

[10] In Defendant Carlson's letter dated December 8, 2000, Carlson did not inform Plaintiff that he had a right to request a hearing as a result of the summary suspension. Instead, Carlson wrote, "If the Committee's final action or recommendation is grounds for a hearing, you may request a hearing..."

opportunity for a hearing, Plaintiff could not challenge the alleged complaint by a Textron employee and Plaintiff could not demonstrate that such complaint did not demonstrate that summary suspension of Plaintiff was warranted in order to ***"reduce the substantial likelihood of imminent injury or damage to the health or safety of any individual,"*** as this is the only basis by which Plaintiff could be summarily suspended from participating in SGHA.

66.

In his December 20, 2000 letter, Defendant King informed Plaintiff that his request for an interview had been granted but that the meeting would not constitute a hearing. The interview was scheduled for January 5, 2001, over two weeks after the Credentialing Committee had already allegedly determined that summary suspension was warranted and that "no further investigation into [Plaintiff's] conduct or practice patterns is necessary."

67.

After he received King's December 20, 2000 letter, Plaintiff again made numerous attempts to obtain information as to why there was a substantial likelihood that any of his patients were placed in imminent danger so he could provide a response at the January 5, 2001 interview but no such information was ever provided to Plaintiff by SGHA or any agents, thereof. The defendants used the general phrase taken directly from the SGHA credentialing plan to summarily suspend Plaintiff from participating in SGHA with the understanding that because of the conspiracy between all of the defendants, individually, jointly and severally, to professionally destroy Plaintiff, Plaintiff would never be able to contest the findings allegedly made by SGHA in a hearing or otherwise.

68.

On December 29, 2000, Plaintiff was notified by Andrew Carlson, MD, acting in his capacity as Medical Director of SGHA, that the Credentialing Committee of SGHA had changed its recommendation to the Board of Directors for corrective action against Plaintiff because Plaintiff had allegedly failed to comply with the corrective action plan which Plaintiff had been forced to sign on November 30, 2000 without being afforded the opportunity for a hearing in order to continue to be a Participating Provider in SGHA. The Committee changed its recommendation and recommended that Plaintiff's membership in SGHA be terminated.

69.

On December 29, 2000, the Board of Directors of SGHA met and unanimously voted to affirm the recommendation that Plaintiff's membership be terminated. Although Plaintiff was informed that he had a right to request a hearing, he was informed that such a hearing would ***focus exclusively on the "failure to comply with the terms of the Corrective Action Plan,"*** and that the Hearing Panel ***would not allow Plaintiff to present any evidence*** of his professional conduct, utilization or referral patterns during the hearing. Accordingly, SGHA had effectively terminated Plaintiff's property and contractual rights with SGHA without giving Plaintiff the notice of the specific allegations of misconduct and the opportunity to be heard on the allegations of misconduct which formed the alleged basis of Plaintiff's summary suspension and the alleged initiation of corrective action against Plaintiff.

70.

On January 5, 2001, even though it had been unanimously voted to terminate Plaintiff's membership in SGHA, Plaintiff attended the interview before the Credentialing Committee as

provided in King's December 20, 2000 letter. At the January 5, 2001 meeting, Carlson read a prepared statement and Plaintiff was offered the opportunity to give a statement if he desired. Since Plaintiff had no knowledge of the specific misconduct of which he had allegedly engaged in, Plaintiff could not present any evidence in response to and in defense of the allegations that led to his summary suspension. Furthermore, Plaintiff specifically requested such information during the interview but Carlson stated that he couldn't provide any specific information to Plaintiff regarding the alleged acts and/or omissions which formed the basis of Plaintiff's summary suspension from SGHA.

71.

On January 10, 2001, Plaintiff requested a hearing regarding the action taken by the Board of Directors of Southwest Georgia Healthcare Association, Inc. on December 29, 2000. The request for a hearing was granted and a hearing was scheduled for March 23, 2001. However, as indicated in Defendant Carlson's December 29, 2000 letter to Plaintiff, this hearing would ***focus exclusively on the "failure to comply with the terms of the Corrective Action Plan," and that the Hearing Panel would not allow Plaintiff to present any evidence of his professional conduct, utilization or referral patterns during the hearing.***

72.

The January 2001 edition of *The AmericUSumter Observer* contained an article referencing an incident where a vice president of Sumter Regional Hospital had slapped an employee that she supervised. Based upon the article, "the administration and the board were aware of the incident but quickly attempted to cover it up." The article compared this incident to a situation where a Black Sumter Regional Hospital employee was terminated for allegedly using

a threatening tone with his supervisor. The January 2001 edition of *The AmericUSumter Observer* also contained a section wherein six different citizens' responses were printed to the question, "Knowing that the black community keeps the hospital open, how can we get Sumter Regional Hospital to stop racial discrimination that is so prevalent there?" The January 2001 edition of *The AmericUSumter Observer* contained an article reviewing the 2000 year which contained the following: "Sumter Regional Hospital's management board is still without the spine to end the discrimination and numerous conflicts of interests that exist on its own board. The NAACP has urged the hospital's management board to make some administrative changes."

73.

On January 19, 2001, Defendant Andrew C. Carlson, M.D., in his capacity as Chairman of Defendant Southwest Georgia Healthcare Association, Inc., wrote a letter to Plaintiff sanctioning Plaintiff for publishing various articles in *The AmericUSumter Observer*, the newspaper published by Plaintiff. In his January 19, 2001 letter, Defendant Carlson threatened Plaintiff and insisted that Plaintiff cause to be printed a "written retraction on the front page above the fold of your newspaper...within ten (10) days of this letter..."

74.

After Plaintiff refused to comply with Defendant Carlson's demand, Defendant Carlson and the other defendants agreed to vigorously act in furtherance of their conspiracy to have Plaintiff's clinical privileges on the Sumter Regional Hospital Medical Staff terminated along with Plaintiff's rights to continue to serve on any other hospital boards or committees to which he belonged.

75.

On February 9, 2001, Defendant Kenneth DiNella, M.D., acting in his capacity as an agent for the Administration of Defendant Sumter Regional Hospital, notified Plaintiff that as a result of the Medical Staff Executive Meeting on February 7, 2001, Plaintiff was relieved from his positions on the following committees at Sumter Regional Hospital: Medical Staff Executive Committee, Credentials Committee, Medical Records Committee, and Medicine subcommittee for peer review. Plaintiff was not given the opportunity to request a hearing and Plaintiff was not given any reasons as to why he was being relieved from his positions on said committees although he was informed that, "[t]his is a temporary restriction pending the completion of the investigation."

76.

Plaintiff was removed from these committees because the defendants already knew that Plaintiff's medical staff privileges were about to be summarily suspended and these committees had to be used in order to effectuate the maliciously preplanned summary suspension of Plaintiff's medical staff privileges at Sumter Regional Hospital. The references made to an alleged investigation was a pretext and was another act in furtherance of the conspiracy to professionally destroy Plaintiff.

77.

On February 12, 2001, just three days after Plaintiff had been informed that he had been removed from the various committees at Sumter Regional Hospital, Defendant Jerry W. Adams, in his capacity as President of Defendant Sumter Regional Hospital, Inc., wrote Plaintiff a letter informing him that the Medical Executive Committee of Sumter Regional Hospital had voted on

the same date to summarily suspend Plaintiff from the Medical Staff membership at Sumter Regional Hospital. While the letter did not specifically state why Plaintiff's privileges were summarily suspended, Plaintiff was later told by Defendant Kenneth DiNella, M.D. that Plaintiff was considered to be disruptive because he had provided confidential information to the NAACP. There was initially no reference made to any quality of care issues or any alleged incompetence with respect to the medical care of Plaintiff's patients as reasons for the summary suspension.

78.

Attached to the notice of summary suspension sent to Plaintiff on February 12, 2001, Defendant Jerry Adams, in his capacity as President of Sumter Regional Hospital, Inc., enclosed copies of pertinent sections of Article VIII, Article IX, Article XIV and the Fair Hearing Plan. Article XIV governs the Confidentiality of Information related to practitioner's professional qualifications, clinical ability, judgment, character, physical and mental health, emotional stability, professional ethics, or any other matter that might directly or indirectly affect patient care.

79.

After Plaintiff was summarily suspended from the medical staff at Sumter Regional Hospital, the conspiracy between the officers, agents, and employees of SGHA and the officers, agents, and employees of Sumter Regional Hospital became more apparent.

80.

Immediately after he was summarily suspended at Sumter Regional Hospital, various persons went to the medical records department at Sumter Regional Hospital and pulled

hundreds of Plaintiff's patient charts to be evaluated in the hopes of finding something that could be later used to justify the summary suspension of Plaintiff.

81.

Acting in furtherance of the conspiracy to professionally destroy Plaintiff, officials of SGHA gave patient charts and summaries of patient charts, records, and reports to Sumter Regional Hospital officials in an effort to attempt to find "any" information which could be used to justify the summary suspensions of Plaintiff from the medical staff at Sumter Regional Hospital. This is especially true since according to the SGHA, once Plaintiff was summarily suspended by Sumter Regional Hospital, SGHA would not have to go forward with Plaintiff's hearing on his termination from SGHA, thereby precluding Plaintiff from establishing that the summary suspension of him by SGHA was done maliciously, intentionally and with the specific intent to harm Plaintiff.[11]

82.

On February 22, 2001, Defendant Andrew Carlson, M.D., in his capacity as Chairman of the Board of Southwest Georgia Healthcare Association, Inc., informed Plaintiff that because Plaintiff had been summarily suspended from Sumter Regional Hospital, Plaintiff was automatically suspended from Southwest Georgia Healthcare Association, Inc. Plaintiff was

---

[11] Plaintiff disagrees with this assertion because the Sumter Regional Hospital Bylaws provide that no decision is final until a final decision is made by the Board. Since Plaintiff had not yet exhausted the appellate process at Sumter Regional Hospital at the time that SGHA postponed Plaintiff's scheduled hearing, any reliance upon SGHA on Sumter Regional Hospital actions taken was a violation of Plaintiff's due process rights. However, due to the conspiracy which existed between SGHA and Sumter Regional Hospital, the officials knew that the appellate process would not enable Plaintiff's medical staff privileges to be reinstated because they knew that the hearing panel in Plaintiff's appeal at Sumter Regional Hospital would consist of members of the conspiracy to harm Plaintiff.

further notified that his hearing scheduled for March 23, 2001 was postponed until Plaintiff could (1) produce evidence that his medical staff privileges at Sumter Regional Hospital have been reinstated; and (2) Plaintiff reapply for membership to Southwest Georgia Healthcare Association, Inc.

83.

On February 14, 2001, through counsel, Plaintiff requested an interview with the Medical Executive Committee in order to obtain the reasons for his summary suspension. On February 24, 2001, Kenneth DiNella, M.D., in his capacity as Chairman of the Medical Executive Committee, informed Plaintiff that he would be granted an interview on February 28, 2001 and that at that time Plaintiff would "be informed of the general nature of the circumstances of the allegations at the time of the interview."

84.

On February 28, 2001, Plaintiff met with the Executive Committee of Defendant Sumter Regional Hospital with respect to the summary suspension of Plaintiff from Defendant Sumter Regional Hospital's Medical Staff. Plaintiff was told at that time by Defendant Kenneth DiNella, M.D. that the basis for his summary suspension was that Plaintiff had provided confidential information to the NAACP concerning Dr. Griffith, Dr. Mitchell and Dr. Campbell. This statement by Dr. DiNella was consistent with the information provided in the "first" notice of summary suspension sent to Plaintiff on February 12, 2001 and with Defendant DiNella's letter of February 24, 2001.

85.

In letters dated February 22, 2001 and February 23, 2001, Plaintiff requested a hearing on

the summary suspension of Plaintiff from medical staff membership and clinical privileges at Defendant Sumter Regional Hospital. Plaintiff also informed the Defendant Sumter Regional Hospital that the notice of suspension sent to him on February 12, 2001 did not comply with the due process requirements outlined in the Health Care Quality Improvement Act (42 § 11112).

86.

On March 12, 2001, Defendant Jerry W. Adams, acting in his capacity as President of Sumter Regional Hospital, Inc., wrote Plaintiff another letter notifying Plaintiff of his summary suspension from medical staff membership and clinical privileges at Defendant Sumter Regional Hospital. This "second" notice was purportedly sent "in order to fully comply with [the Health Care Quality Improvement Act] with regard to affording [Plaintiff] ample time to prepare for the hearing."[12] The March 12, 2001, letter also informed Plaintiff that he would be afforded the opportunity for a hearing which was scheduled for April 30, 2001.

87.

On March 13, 2001, the day after Defendant Jerry Adams sent Plaintiff a "second" notice of the summary suspension of Plaintiff's clinical privileges, the medical staff of Defendant Sumter Regional Hospital, Inc., purportedly adopted a Resolution to amend the Fair Hearing Plan in part to comply with the requirements of the Health Care Quality Improvement Act. The Amendments to the Fair Hearing Plan were formally approved and adopted by the Medical Staff on March 14, 2001.

---

[12] The notice sent to Plaintiff on March 12, 2001 was in violation of the Bylaws of Sumter Regional Hospital in existence at that time.

88.

On March 22, 2001, Plaintiff hand delivered letters to Defendants Garth, Busman, Morgan, and Tu a letter specifically requesting that they, as members of the Medical Executive Committee, perform a thorough investigation into the actions that had been taken against him. Plaintiff also stated in his letter to these members of the Medical Executive Committee that he was a Black person with responsibility to his people before he was a physician and that he would continue to pursue correcting the problems of racial discrimination at Sumter Regional Hospital.

89.

Consistent with the previous acts done against Plaintiff in retaliation for speaking out on racial discrimination at Sumter Regional Hospital, on March 22, 2001, Defendant Jerry Adams, in his capacity as President of Sumter Regional Hospital, Inc., sent Plaintiff a notice that the Medical Executive Committee had made a recommendation that certain corrective action be taken against Plaintiff. Plaintiff was also notified that he could request a hearing with regard to the corrective action recommendations in the March 22, 2001 letter.[13]

90.

Acting in furtherance of the conspiracy to professionally destroy Plaintiff, on March 23, 2001, Defendant Jerry Adams, in his capacity as President of Sumter Regional Hospital sent Plaintiff a notice that the Medical Executive Committee had made a recommendation that certain

---

[13] Plaintiff requested a hearing on this action on April 10, 2001. Plaintiff requested the hearing because the Bylaws state that if a hearing is not requested, the physician waives any rights to an appeal of the decision of the committee. However, Plaintiff is filing herewith a motion for a preliminary injunction to enjoin any and all further hearings and/or proceedings against him because such hearings would be futile given that the members serving on the hearing panel would be determined by the defendants named herein.

corrective action be taken against Plaintiff and that the recommendation of the Medical Executive Committee had been reviewed and approved by the Medical Staff. The recommendation required that Plaintiff be suspended from all clinical privileges at Sumter Regional Hospital until certain conditions are met. Plaintiff was notified that he had a right to request a hearing with regard to the March 23, 2001, Corrective Action recommendations pursuant to the Fair Hearing Plan.[14]

91.

The actions taken against Plaintiff referenced in paragraphs 88 and 89 were taken with the specific intent to retaliate against, intimidate and further harass Plaintiff for complaining about racial discrimination by and within Sumter Regional Hospital. Said acts were acts done by the defendants, individually, jointly and severally, in furtherance of the conspiracy to retaliate against Plaintiff and drive him out of the practice of medicine in Americus Sumter County, all because of his race, Black, and because of his opposition to discriminatory practices by Sumter Regional Hospital against Blacks while acting in his capacity as President of the Americus Sumter Chapter of the NAACP and as Publisher of *The AmericUSumter Observer*. The acts of the defendants were done maliciously, willfully, and intentionally and showed that entire want of care that would raise the presumption of a conscious indifference of their acts with respect to the consequences to Plaintiff.

---

[14] Plaintiff requested a hearing on the March 23, 2001 corrective action recommendations on April 10, 2001. See also footnote 12 herein.

**CLAIMS ASSERTED**

COUNT I

92.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 91 of this Complaint.

93.

The defendants are liable individually, jointly and severally pursuant to 42 U.S.C. § 1983 for violating and conspiring to violate Plaintiff's rights guaranteed by the First Amendment of the United States Constitution by retaliating against Plaintiff, in his capacity as NAACP President, for exercising his rights of freedom of speech by complaining about a matter of public concern, racial discrimination against Blacks by Sumter Regional Hospital, Inc.

94.

The defendants are liable individually, jointly and severally pursuant to 42 U.S.C. § 1983 for violating and conspiring to violate Plaintiff's rights guaranteed by the First Amendment of the United States Constitution by retaliating against Plaintiff, in his capacity as NAACP President, for exercising his rights of freedom of association by holding the office of President of the Americus Sumter Chapter of the NAACP, while a physician on the staff of Sumter Regional Hospital.

COUNT II

95.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 94 of this Complaint.

96.

The defendants are liable individually, jointly and severally pursuant to 42 U.S.C. § 1983 for violating and conspiring to violate Plaintiff's rights guaranteed by the First Amendment of the United States Constitution by retaliating against Plaintiff, in his capacity as Publisher of *The AmericUSumter Observer* for exercising his rights of freedom of the press because Plaintiff is the publisher of a newspaper which periodically published articles complaining about racial discrimination against Blacks by Sumter Regional Hospital, Inc.

COUNT III

97.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 96 of this Complaint.

98.

The defendants are liable individually, jointly and severally pursuant to 42 U.S.C. § 1981 for discriminating against Plaintiff in the making and enforcement of his contract with Southwest Georgia Healthcare Association, Inc.

COUNT IV

99.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 98 of this Complaint.

100.

The defendants are liable individually, jointly and severally pursuant to 42 U.S.C. § 1985(3) for conspiracy with the intent and purpose of depriving Black persons, either directly or

indirectly, of the equal protection of the laws, or of equal privileges and immunities of the laws and for acting in furtherance of said conspiracy to injure Plaintiff by depriving him of his property right to engage in the practice of medicine.

COUNT V

101.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 100 of this Complaint.

102.

The defendants are liable individually, jointly and severally pursuant to 42 U.S.C. § 1985(2) for conspiracy with the intent and purpose of deterring, forcing, or intimidating Plaintiff, in his capacity as President of the Americus-Sumter chapter of the NAACP, from filing an action in the United States District Court against Sumter Regional Hospital for discrimination against Blacks.

COUNT VI

103.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 102 of this Complaint.

104.

The defendants are liable individually, jointly and severally, pursuant to 42 U.S.C. § 1986 because despite their knowledge of the conspiracy to retaliate against Plaintiff for complaining about racial discrimination by Sumter Regional Hospital and despite their ability to prevent or aid in preventing the same, the defendants intentionally neglected and refused to do so.

COUNT VII

105.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 104 of this Complaint.

106.

Southwest Georgia Healthcare Association, Inc., (SGHA), its officials, officers, and agents are liable individually, jointly and severally pursuant to O.C.G.A. § 51-1-6 for violating its Credentialing Plan and ByLaws during its summary suspension of Plaintiff and termination of Plaintiff's membership in SGHA.

COUNT VIII

107.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 106 of this Complaint.

108.

Sumter Regional Hospital, (SRH), its officials, officers, and agents are liable individually, jointly and severally pursuant to O.C.G.A. § 51-1-6 for violating the Sumter Regional Hospital ByLaws during the summary suspension of Plaintiff's medical staff privileges on February 12, 2000, and for the removal of Plaintiff from the various committees to which Plaintiff belonged (Medical Staff Executive Committee, Credentials Committee, Medical Records Committee, and Medicine subcommittee for Peer Review) on February 7, 2001.

COUNT IX

109.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 108 of this Complaint.

110.

The defendants are liable individually, jointly and severally pursuant to O.C.G.A. § 51-1-9 for tortuous interference with business relations and tortuous interference with contractual relations.

COUNT X

111.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 110 of this Complaint.

112.

The defendants are liable individually, jointly and severally pursuant to O.C.G.A. § 51-5-4 for defamation for reporting that Plaintiff had engaged in conduct that caused the substantial likelihood of imminent danger to the health or safety of a patient.

COUNT XI

113.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 112 of this Complaint.

114.

The defendants are liable individually, jointly and severally pursuant to O.C.G.A. § 51-5-

1 for defamation for reporting that Plaintiff has been negligent and/or incompetent as a physician.

COUNT XII

115.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 114 of this Complaint.

116.

The defendants are liable individually, jointly and severally pursuant to O.C.G.A. § 51-5-9 for defamation for reporting that Plaintiff was incompetent and had engaged in conduct related to quality of care issues.

COUNT XIII

117.

Plaintiff restates, realleges and incorporates herein by reference each and every allegation as stated and set forth with particularity in paragraphs 1 through 116 of this Complaint.

118.

The defendants are liable individually, jointly and severally pursuant to 42 U.S.C. § 1988 for all costs and attorney fees associated with the prosecution of this action.

WHEREFORE, Plaintiff prays for judgment against the defendants as follows:

( A ) That the Court enter a preliminary and permanent injunction enjoining the hearing before the Sumter Regional Hospital committee scheduled for April 30, 2001;

( B ) That the Court enter a preliminary and permanent injunction enjoining any other hearings related to the matters asserted in this Complaint;

( C ) That the Plaintiff have injunctive relief against all of the defendants preventing

and precluding the continuation of any conduct or actions taken in furtherance of the conspiracy being practiced against him;

( D ) That Plaintiff recover compensatory damages from the defendants individually, jointly and severally, in an amount to be determined at trial, but not less than Ten Million Dollars;

( E ) That Plaintiff recover exemplary and/or punitive damages from the defendants individually, jointly, and severally, in an amount to be determined at trial, but not less that Fifteen Million Dollars;

( F ) That Plaintiff be granted a trial by jury with respect to all issues triable to a jury;

( G ) That Plaintiff recover all costs and attorneys fees associated with the prosecution of this action; and

( H ) That Plaintiff have such other and further relief as the Court deems equitable, just and proper.

Respectfully Submitted,

GEORGE W. MCGRIFF
Georgia Bar No. 493228

ERIC WYATT
Georgia Bar No. 778955

**GEORGE W. MCGRIFF & ASSOCIATES**
**Century Lake Office Park**
**1774 Century Boulevard, NE**
**Atlanta, Georgia 30345-3312**
**(404) 325-2755**